UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

                      Plaintiff,

              10 CIV. 4270 (SHS)

-against-

KENNETH IRA STARR, STARR INVESTMENT
ADVISORS, LLC, and STARR & COMPANY, LLC,

                      Defendants,

DIANE PASSAGE and COLCAVE, LLC,

                      Relief Defendants.
------------------------------------------------------------------------x

## FIRST REPORT OF THE TEMPORARY RECEIVER

      Aurora Cassirer, Esq., in her capacity as temporary receiver (the "Receiver") for Starr Investment Advisors, LLC ("SIA"), Starr & Company, LLC ("Starr & Co," and together with SIA, collectively the "Starr Companies") and Colcave LLC ("Colcave"), appointed in the above-captioned case (the "Receivership Action") by Order of this Court dated June 10, 2010 (the "Receivership Order," ECF Docket No. 14), respectfully submits this initial report to the Court and to the Securities and Exchange Commission (the "SEC") concerning her activities as Receiver during the period from June 10, 2010 to July 7, 2010. As discussed below, the Receiver requests that the Court grant SEC's motion for preliminary injunctive relief, as requested in the SEC's letter filed in this action on July 7, 2010 and thereby, *inter alia*, appoint the Receiver on a permanent basis; and further that the Court permit the Receiver to continue to conduct documentary discovery of persons or entities who are not parties to the SEC Action with regard to matters relevant to the business and affairs of the Starr Companies and Colcave,

1

subject to the Receivers' right to seek permission from this Court to engage in other types of discovery and the right of the government or other parties to this action to object to specific discovery requests made by the Receiver.

1. By Order of this Court dated June 1, 2010 (ECF Docket No. 5), I was appointed interim monitor for the Starr Companies. My tenure as interim monitor continued until June 10, 2010, when I was appointed temporary receiver pursuant to the Receivership Order.

2. On June 4, 2010, in advance of an anticipated hearing with respect to the SEC's motion for preliminary injunctive relief, which was then scheduled for June 10, 2010, I filed a First Report of Interim Monitor (the "Monitor's Report") summarizing my activities as Interim Monitor for the first four days of my tenure as Interim Monitor (ECF Docket No. 11). The instant First Report of Temporary Receiver summarizes my activities as Receiver during the period of almost one month since the receivership commenced.

Preliminary Statement

3. As described in some detail below, I have determined very quickly during my brief tenure to date as Monitor and as Receiver that the Starr Companies are no longer conducting any business and are not capable of doing so. Moreover, I have preliminarily concluded that there are few if any assets of significant value held in the name of, or on the books of the Starr Companies. However, my initial investigations have also led me to believe that that there are substantial claims that I could pursue, and assets that I could seek to recover, as Receiver, which could inure to the substantial benefit of victims of Kenneth Starr's apparent fraudulent activities. In order to identify and document such claims and assets in a manner sufficient to warrant litigation, which would likely involve a substantial investment of time and effort, I need to continue documentary discovery that I have already commenced, including

discovery of documents in the possession, custody or control of seven banking and securities institutions that did business with the Kenneth Starr and the Starr Companies, and two law firms and a former partner of those two firms who represented the Starr Companies and conducted numerous and substantial escrow transactions purportedly on behalf of the Starr Companies through which funds taken from the accounts of Starr Company clients were apparently diverted and misappropriated to the personal purposes of Kenneth Starr. As discussed below, I can continue to develop the facts necessary to pursue claims and assets for the benefit of victims of the Starr fraud so long as my discovery efforts are not thwarted or impeded by an overly broad stay of the SEC Action.

4. I understand that Kenneth Starr has raised Fifth Amendment concerns in his motion to stay the SEC Action. As discussed below, the discovery that I have commenced, and that I presently intend to pursue is directed only toward persons or entities that are neither parties to the SEC Action nor former clients of the Starr Companies. Such third-party discovery does not impinge upon Mr. Starr's Fifth Amendment rights.

The Starr Companies Are No Longer Operating Entities

5. As indicated in my Monitor's Report, the business of Starr & Co involved, in large measure, the management of the personal affairs of high-net-worth clients (including individuals, business entities, personal trusts and others). For these personal management clients, Starr & Co performed accounting, bookkeeping and tax return preparation services. Starr & Co also collected and deposited into one or more of the client's bank accounts various forms of income (royalty checks, performance fees, etc.), and from the same client bank account(s), Starr & Co paid, or arranged for the client to pay, mortgage bills, rent bills and a host of other types of obligations of the client, including in some cases the salaries of the client's employees

3

(which were paid through Paychex). As of June 1, 2010, based upon records that I obtained at the premises of the Starr Companies, and conversations with key employees of Starr & Co, it appeared that there were only 30 or 40 personal management clients left, down from approximately 140 just a month or two earlier, and the list of remaining clients was getting smaller each day as clients, or their attorneys or other representatives, asked that the clients' accounts be transferred to new management companies. At that time, various account managers had left the firm, and others were leaving the firm, and the clients that the managers had serviced were for the most part leaving with them.

6. As of the date of this report, to my knowledge all clients of Starr & Co. have terminated their management service relationships with Starr & Co. In many instances, former clients of Starr & Co have advised me or my retained professionals, either directly or through their accountants, attorneys or other representatives, that they have remained with the managing director who serviced their account while at Starr & Co. In other instances, former clients of Starr & Co. have advised me or my professionals that they have formed management relationships with new representatives or that they are currently acting on their own behalf. In any event, as of the time that I assumed the position of Receiver, Starr & Co was effectively out of the business of providing personal client management services.

7. The other principal component of the Starr Companies' business was the investment advisory and management business conducted by SIA, a registered investment advisory firm. Because of the government's freeze on bank accounts of the Starr Companies and related injunctive relief, to my knowledge there was no investment activity being conducted at SIA at the time of my appointment as Monitor. Thus, as with Starr & Co., as of the date that I became the Monitor of SIA, that company was effectively no longer conducting business.

The Starr Companies' Current Liabilities Greatly Exceed Their Known Assets

8. As of June 1, 2010, according Ms. Roseann Ragano, the individual who was employed as the controller for Starr & Co, the Starr Companies owed approximately $1.2 million in various payables and the weekly payroll obligation of the Starr Companies was approximately $139,000 (All employees were on the payroll of Starr & Co). In addition, I discovered that Starr & Co was in arrears in the payment of health insurance premiums for its group health insurance plan, and that some amounts withheld from employees' compensation for contribution to a company 401(k) Plan had not in fact been contributed to the Plan.

9. On the other hand, as of June 1, 2010, there was only approximately $150,000 in the Starr Companies' bank accounts, and those funds were not available for use by the Starr Companies, or by me as Monitor or Receiver, because the Starr Company accounts are subject to the bank account freeze imposed in favor of the government.[1] Since my appointment as Monitor and then Receiver, I have had several conversations with representatives of the US Attorney's Office concerning whether the funds in the Starr Company accounts will be made available to the Receiver for the payment of expenses of the receivership estates. It is my understanding that the US Attorney's Office is inclined to permit the Receiver to use such funds to the extent that they appear to be derived from the payment of fees charged to clients, rather by way of misappropriations from client bank accounts. Based upon my review of available bank records, it appears that approximately $117,000 of funds in the Starr Company accounts can be attributed definitively to clients' fee payments and therefore will be available to the Receiver for payment of receivership expenses.

10. In addition, from conversations with representatives of the SEC and the US

---

[1] In addition to funds in the Starr Company accounts, there is approximately $700,000 in an account of Colcave, which is also subject to the government's freeze.

5

Attorney's Office, it has been my understanding from the inception of the receivership that I am authorized and entitled, without regard to the freeze on Starr Company accounts, to open receivers' bank accounts and to deposit into those accounts and use for receivership estate purposes any amounts collected from clients of the Starr Companies since the date of my appointment at Monitor.  On, June 23, 2010, I did in fact open a receivership bank account for each of the Starr Companies and Colcave at Wachovia.  I have to date been able to collect from former clients of the Starr Companies and to deposit into the receivership accounts the sum of $115,583.52 for Starr & Co and $12,716.25 for SIA.  There have been no Colcave collections or deposits into the Colcave receivership account.

11. I understand that monthly billings of the Starr Companies in the months just before the SEC Action were approximately $650,000, but as of the first day of my appointment as Monitor, the May bills had not been issued.  Since June 1, 2010, with some help from the former controller of Starr & Co, and with additional help from my retained professionals and clerical employees of my counsel, Troutman Sanders LLP ("Troutman Sanders"), I have been able to issue bills to former Starr Company clients for the month of May, 2010 totaling approximately $600,000.  The process of issuing those bills was difficult and time consuming, and is still continuing, because the billing and collection records of Starr & Co are not complete, up to date, adequately organized or recorded in any accessible manner in the Starr & Co computers.

12. As indicated above, as a result of the billing and the collection efforts of my professionals and clerical support, the receivership estates have collected approximately $128,000 in fees from clients of the Starr Companies.  If, as I anticipate, I will have access to approximately $117,000 of funds that were on deposit in the Starr Company accounts as of the

6

time of my appointment as Monitor, then the funds available to the receivership estates currently or in the near terms would total approximately $245,000. I expect that there will be additional fee collections from former clients of the Starr Companies (see discussion of the Sikelia Productions account receivable below at paragraph 23), but I cannot presently estimate the timing or amount of such collections. As the Court can appreciate, clients may raise issues or assert defenses that will in some instances make the collection process complicated, protracted, and possibly prohibitively expensive.

13. As reflected above, it is now quite apparent that the receivership estates of the Starr Companies are not conducting business from which new income can be derived. The same is of course true for Colcave, which to my knowledge was created merely to own the apartment in which Kenneth Starr and his wife resided at the time of Mr. Starr's arrest and has never conducted any income-generating business activities. It also appears from my review of available business records of the Starr Companies that there are no assets of significant value <u>on the books</u> of, or <u>in the name of</u>, the Starr Companies, from which the Receiver can expect to generate proceeds for use in the payment of receivership expenses or for payments to creditors of the receivership estates.

14. In this regard, the Starr Companies have only one business premises, at 850 Third Avenue, New York, New York. There are numerous items of furniture, fixtures and equipment (used computers, televisions, printers, desks, etc.) which presumably belong to the Starr Companies and can be liquidated. I intend to obtain professional advice with respect to the valuation and sale, or other disposition, of such property, but I do not expect that such used property will produce significant proceeds. In addition, there are assorted paintings, photographs and other art or decorative items in the Starr offices. Although I have not yet consulted an expert

in the disposition of such objects, it does not appear that the art and decorative objects in the Starr offices will generate proceeds sufficient to make a material contribution to the payment of estate expenses or to the claims of creditors of the receivership estates.  The disposition of such objects may also be complicated by the fact that ownership of such objects may be in dispute as between the Starr Companies and Mr. Starr or other Starr family members personally.

15. For all the foregoing reasons, it has been clear since the date that I assumed the role of Receiver that the liabilities of the Starr Companies far exceed the known assets of the Starr Companies and that the Starr Companies have no business to conduct.  The Starr Companies are thus effectively in liquidation.

The Starr Companies' Employees Have Been Terminated

16. Recognizing the harsh reality of the situation at the Starr Companies, including the fact that there were no funds available to pay payroll, that employees could not expect to be covered by a current health insurance policy, and that employees' 401(k) contributions had apparently been diverted by Kenneth Starr, I had not choice but to confirm to all of the employees of the Starr Companies that their employment had to be terminated.  In some cases, the terminations were effective May 28, 2010, the end of the last pay period for which many, but not all, of the Starr employees received their compensation.  For other employees, the terminations were effective as of June 11, 2010, the last date when they came to the Starr offices.

17. During the monitorship period, and continuing into the receivership period, I and my professionals have been forced to address many questions and concerns raised by employees of the Starr Companies concerning whether or how they may ever collect claims for unpaid wages or benefits, what alternatives the employees have for new health coverage, whether and how the employees will be able to access their funds in the Starr & Co 401(k) Plan.  With the

advice of benefits professionals of Troutman Sanders, I was able to determine that the documentation of the Starr & Co 401(k) Plan was sufficiently up to date to permit employees to make withdrawals without facing undesirable tax consequences, and I have in fact processed numerous requests by former employees for access to their funds. I believe that no good purpose is served by continuing the Starr & Co 401(k) Plan in existence, and that the Plan should therefore be terminated. I have been reluctant to terminate the plan while I am still acting as a "temporary" receiver, but in the event that this Court determines that my receivership should no longer be considered "temporary," I would then proceed to terminate the Starr & Co 401(k) Plan and advise all former employees that they must take steps to have their 401(k) funds moved to personal IRA or other types of accounts.

The Receiver Has Been Deluged with Clients' Requests for Files

18. As the Court can appreciate, I and my professionals have been inundated with requests by representatives of former Starr clients for delivery of the clients' files, including everything from current mail received by at the Starr offices on behalf of clients (all manner of monthly bills, tax notices, investment account statements, etc.) to tax preparation materials needed for immediate tax filings, to historic account files at the premises of the Starr Companies or in off site storage. These requests have been particularly daunting for two principal reasons. First, by reason of subpoenas served by the US Attorney's Office, the Receiver is required to retain and preserve original client files. That means that the Receiver must arrange with clients to have the client's files identified, boxed and turned over to an outside copying service for either copying or scanning at the client's expense. When the originals are copied, they are returned to the Starr premises for continued storage and preservation. As one can imagine, this process is extremely time consuming and laborious, and requires frequent communications with client

representatives and constant involvement by my retained professionals and clerical staff support to make sure that the high volume of requests can be processed as efficiently and cost-effectively as possible, and that the original client files are preserved.

19. In addition, the processing of client requests for files has been rendered all the more difficult and time consuming because I and my professionals have had little or no access to former Starr & Co employees who could have rendered valuable assistance to the Receiver in this process, including the controller who could have assisted in issuing the final bills to former clients and determining the amounts of prior outstanding receivables (which the Receiver is attempting to collect as part of the file transfer process) and file room staff who could have assisted in locating, organizing and assembling client files.

<u>If Permitted, the Receiver Intends to Investigate and Pursue Possible Claims and Assets</u>

20. The Court can appreciate from the foregoing discussion that the few tangible or intangible assets that are held in the name of the Starr Companies will not likely produce sufficient proceeds to permit a material distribution to victims of Kenneth Starr's apparent fraud. However, I believe, based upon investigations that I and my professionals have conducted to date, including the examination of documents at the Starr offices and conversations with key employees of the Starr Companies, that there may be numerous claims that could be pursued by the receivership estates and numerous assets that might be recovered by the receivership estates for the benefit of victims and other creditors.

21. As Receiver, I am uniquely situated to pursue fraudulent conveyance claims based upon transfers made by the Starr Companies for less than adequate consideration. I can also pursue malpractice claims, or claims for breach of fiduciary duty, against professionals who represented the Starr Companies. Such claims are separate and apart from, and would not

overlap with, any criminal forfeiture claims that the US Attorney's Office has standing to pursue on behalf of victims. In addition, it is already apparent to me that numerous entities formed by Kenneth Starr hold investment interests or properties that Kenneth Starr obtained in exchange for inducing clients of the Starr Companies to make certain investments, or by using funds diverted from accounts of the Starr Companies or clients of the Starr Companies. As Receiver, I would maintain that such assets rightfully belong to the Starr Companies and should be recovered and liquidated for the benefit of victims.

22. Before I can commence actions to pursue claims or assets as aforesaid, I need to conduct further extensive examinations of available documentary evidence, and to obtain relevant records from third parties who had business dealings with Kenneth Starr of his companies. To that end, I and my professionals have already prepared and served numerous third party document subpoenas seeking the production of documents from seven banking and brokerage institutions that conducted business with Starr Companies or Kenneth Starr, and from two law firms and a former partner of both firms, who represented the Starr Companies and conducted numerous substantial escrow transactions purportedly on behalf of the Starr Companies, through which funds taken from the accounts of Starr Company clients were apparently diverted and misappropriated to the personal purposes of Kenneth Starr. It is important to the receivership estates that I be permitted to continue the discovery sought by such subpoenas, and to serve additional document subpoenas upon other <u>non-parties</u> as may be necessary in the future.

23. Just by way of example, I have discovered that in August of 2007, a company called Pastar, LLC, which was formed and is owned solely by Kenneth Starr, made a $1,390,000 deposit toward the purchase of a $13,900,000 condominium apartment at 170 East End Avenue,

New York, New York. The contract has never closed and Pastar, LLC's right to obtain the return of its deposit is in dispute. Based upon my preliminary investigation, I believe that I may have a claim, as Receiver of the Starr Companies, to recover the deposit made by Pastar, LLC, and I have so notified the seller and purchaser so that the rights of the receivership estates can be preserved pending my further investigation of the matter.

The Receiver Is Pursuing Collections of Delinquent Client Bills

24. In connection with the process of former clients' requests for the turnover of files, I have been attempting to collect unpaid bills rendered by the Starr Companies to such clients. Many clients were current except with respect to the most recent invoice issued for the month of May, 2010, but some were, according to the books of the Starr Companies, in arrears for substantial amounts.

25. Of the clients in arrears in the payment of bills, the largest single receivable on the books of the Starr Companies is a receivable in the approximate amount of $600,000 owed by a company called Sikelia Productions ("Sikelia"). Sikelia is the production company of Martin Scorsese, a well known movie producer and director. The receivable owed by Sikelia represents amounts accruing over a period of over two years. The Starr managing director on the Sikelia account left the Starr Companies to join a new management firm at the beginning of 2010, and the Sikelia account followed him. After the account moved to the new management firm, a dispute arose between Kenneth Starr and the ex-managing director as to whether the Sikelia receivable was actually owed, or whether Sikelia could in any event afford to pay the amount that was concededly owed. The issue was not resolved. Based upon the records of the Starr Companies, and conversations that I and my professionals have had with former Starr & Co employees, I believe that I have valid claims to assert against Sikelia and Mr. Scorsese for the

unpaid receivable amount reflected on the Starr Companies' books. I am in the process of filing a complaint to seek such payment, and I expect to have such complaint filed by the close of business today.

26. There are other, smaller, receivables on the books of the Starr Companies that I am considering pursuing. In each case, these additional receivables will be pursued if I am satisfied that the cost of litigation is justified.

<u>The Receiver Has Retained Professionals to Assist in the Administration of the Estates</u>

27. In order to expeditiously assess the situation at the Starr Companies, and to address the numerous operations issues which came to my attention as Monitor, I was fortunate to be able to enlist the assistance of other attorneys and support staff within my law firm, Troutman Sanders. When I was appointed Receiver, I was granted the express authority to retain professionals, and I have in fact retained Troutman Sanders as my counsel.

28. In addition, when I was appointed Receiver, I proceeded expeditiously to interview various financial and accounting firms, with established forensic accounting capabilities, to assist me as Receiver in, among other things: (a) establishing a firm understanding of and control over the books and records of the companies, and to reconstruct records where necessary; (b) conducting necessary investigations for possible fraudulent or otherwise illicit transfers and transactions involving the Defendants, the Relief Defendants or other involved persons; and (c) identifying other claims that might be pursued or assets that might be recovered for the benefit of creditors. As a result of that process, I determined that the Receivership estates would benefit from the retention of the firm of J.H Cohn LLP as accountants and financial advisors, and I engaged that firm. J.H. Cohn began its services on behalf of the Receiver by examining the payroll records and other current records of the Starr

Companies and assisting the Receiver to rapidly assess the financial situation of the Starr Companies. Unfortunately, in light of the obvious uncertainties as to the amount of funds that would be available in the short or long term for payment of professional fees and other administrative expenses of the receivership estates, I was forced to put the efforts of J.H. Cohn on hold. However, should it appear hereafter that sufficient resources are available, I am very much inclined to seek the further forensic assistance of J.H.Cohn to identify and develop the evidentiary support for claims or assets that the Receiver might pursue on behalf of the receivership estates.

### The Receivership Should No Longer Be Considered Temporary And the Receiver's Documentary Discovery of Non-Parties Should Not Be Impeded

29. Kenneth Starr has filed a *pro se* motion to stay the SEC Action. I understand that the US Attorney's Office is also in favor of a stay of the SEC Action and has filed a motion seeking such relief. The SEC has requested, by its letter of July 7, 2010, that the Court proceed to enter the SEC's proposed Order for preliminary injunctive relief, and if such Order is entered and the Receiver is not stayed from her duties as provided in the proposed injunction Order, the SEC does not oppose a stay of the action. Assuming that the receivership will become permanent under the SEC's proposed injunction Order, and further assuming that the Receiver is not prevented from proceeding with essential documentary discovery, the Receiver also does not oppose a stay.

30. Assuming that the receivership estates are to continue, it is respectfully submitted that the receivership should no longer be designated as "temporary." The receivership is moving into its second month, and if continued, the receivership will last for many more months. As discussed above, there are certain critical and irrevocable decisions that the Receiver must make or actions that the Receiver must take in the near term, such terminating the Starr & Co 401(k)

Plan, vacating the offices of the Starr Companies, or liquidating assets located in those premises, and I feel that it would be more appropriate to wait until the receivership is no longer considered "temporary" before making such decisions or taking such actions. Entry of the SEC's proposed Order would accomplish transition from a "temporary" receivership to a permanent receivership.

31. In addition, as described above, the primary benefit of the receivership is the ability of the Receiver to investigate, and where warranted, to pursue claims and assets that might be recovered by the receivership estates for the benefit of creditors. To perform that function, the Receiver needs to continue the documentary discovery that she has commenced against various non-parties, and she needs to serve additional documentary subpoenas on third parties as necessary hereafter.

32. To date, I have not sought documentary discovery from any persons or entities that are known clients of the Starr Companies, and I do not presently intend to serve document subpoenas upon clients of the Starr Companies. The discovery that I have commenced and seek to continue accordingly should not impair or impinge upon any Fifth Amendment rights of Kenneth Starr. Should I determine in the future that discovery of any former clients of the Starr Companies is necessary, I will advise the parties to the SEC Action and the US Attorney's Office so that any concerns can be raised and addressed at that time.

33. It is respectfully submitted that a stay of the Receiver's ability to take formal discovery should be limited only to the extent necessary to prevent such discovery from compromising the U.S. Attorney's criminal case. When addressing a stay of discovery, courts generally consider the interests of the parties to the civil action, interested third parties, the courts and the public; the basic goal being to avoid prejudice. *SEC v. Cioffi*, 2008 U.S. Dist. LEXIS 86088 (E.D.N.Y. Oct. 23, 2008); *See SEC v. Jones*, 2005 U.S. Dist. LEXIS 25325 (S.D.N.Y.

Oct. 28, 2005). Similar to *Coiffi*, here, the U.S. Attorney's request for a stay exists in a vacuum: none of the defendants or relief defendant for which the Receiver was appointed have answered the civil complaint or propounded any discovery requests. Accordingly, this Court should not, at this time, engage in any meaningful balancing of the competing interests at stake. *See Cioffi*, 2008 U.S. Dist. LEXIS 86088 at * 3.

34. Thus, without specific discovery requests and specific objections by the U.S. Attorney's Office, the strength of the government's concerns cannot be evaluated. The more sensible approach, and the one taken by prior courts of competent jurisdiction, is to deny a blanket stay of discovery by the defendants and relief defendant for which the Receiver was appointed, and allow discovery to go forward subject to the U.S. Attorney's ability to object to particular requests. *Id.*

35. Notwithstanding the foregoing, the Receiver is in favor of cooperating with the government and supporting the government's efforts on behalf of victims of the Starr fraud to the extent that her efforts on behalf of the same victims are not unnecessarily thwarted or impeded. To this end, the Receiver submits that the interests of all parties could be accommodated if the Receiver is permitted to continue to engage in documentary discovery of third parties, without prejudice to the Receiver's right to seek additional types of discovery upon motion to the Court, or the right of the government or other parties to this action to object to specific discovery requests made by the Receiver.

Dated: New York, New York
      July 8, 2010

                              Respectfully submitted,

                              /s/ Aurora Cassirer
                              Aurora Cassirer, Temporary Receiver
                              aurora.cassirer@troutmansanders.com

and

Troutman Sanders, LLP
Counsel to the Temporary Receiver

By: /s/Lee W. Stremba
      Lee W. Stremba
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
212-704-6000
lee.stremba@troutmansanders.com