TROUTMAN SANDERS LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: 212-704-6000
Fax: 212-704-6288
Lee W. Stremba

*Attorneys for Receiver*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 10  CIV. 4270 (SHS) |
| -against- | : | |
| | : | |
| KENNETH IRA STARR, STARR INVESTMENT | : | |
| ADVISORS, LLC, and STARR & COMPANY, LLC, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| DIANE PASSAGE and COLCAVE, LLC, | : | |
| | : | |
| Relief Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FIRST INTERIM APPLICATION OF AURORA CASSIRER,**
**RECEIVER, AND TROUTMAN SANDERS LLP, AS ATTORNEYS**
**FOR THE RECEIVER, FOR COMPENSATION FOR**
**PROFESSIONAL SERVICES RENDERED AND FOR**
**REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES**
**INCURRED DURING THE FIRST INTERIM FEE PERIOD FROM**
**JUNE 1, 2010 THROUGH AUGUST 31, 2010**

APPLICATION OF THE RECEIVER

NAME OF APPLICANT:                                AURORA CASSIRER, RECEIVER

DATE OF APPOINTMENT:                          June 1, 2010[1]

PERIOD FOR WHICH COMPENSATION AND
    REIMBURSEMENT IS SOUGHT:             June 1, 2010 through August 31, 2010

AMOUNT OF COMPENSATION REQUESTED:     $51,018.75

AMOUNT OF EXPENSE REIMBURSEMENT
    REQUESTED:                                      $111.72

TOTAL COMPENSATION AND EXPENSE
    REIMBURSEMENT REQUESTED:              $51,130.47

TOTAL COMPENSATION AND EXPENSES
    PREVIOUSLY REQUESTED AND AWARDED:     NONE


APPLICATION OF COUNSEL TO THE RECEIVER

NAME OF APPLICANT:                                TROUTMAN SANDERS LLP

AUTHORIZED TO PROVIDE PROFESSIONAL
    SERVICES TO:                                     AURORA CASSIRER, RECEIVER

DATE OF RETENTION:                             June 7, 2010

PERIOD FOR WHICH COMPENSATION AND
    REIMBURSEMENT IS SOUGHT:             June 7, 2010 through August 31, 2010

AMOUNT OF COMPENSATION REQUESTED:     $254,899.53

AMOUNT OF EXPENSE REIMBURSEMENT
    REQUESTED:                                      $1,994.75

TOTAL COMPENSATION AND EXPENSE
    REIMBURSEMENT REQUESTED:              $256,894.28

TOTAL COMPENSATION AND EXPENSES
    PREVIOUSLY REQUESTED AND AWARDED:     NONE

---

[1] On June 1, 2010, Aurora Cassirer was appointed Interim Monitor for Starr & Company, LLC, Starr Investment Advisors, LLC and Colcave, LLC.  She was appointed Temporary Receiver for the same entities on June 7, 2010 and Receiver for the same entities on July 8, 2010.  This first interim application for compensation includes services rendered by Aurora Cassirer as Interim Monitor, Temporary Receiver and Receiver.

TO      THE HONORABLE SIDNEY H. STEIN,
        UNITED STATES JUDGE:

Aurora Cassirer (the "Receiver") and Troutman Sanders LLP ("Troutman"), attorneys for the Receiver, submit this first interim fee application (the "First Interim Fee Application") pursuant to the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "Billing Instructions") for allowance and approval of interim compensation:  (a) for services rendered by the Receiver and actual and necessary expenses incurred by the Receiver during the period from June 1, 2010, the date of her appointment as Interim Monitor, through and including August 31, 2010[1] in the amount of $51,130.47 ; and (b) for services rendered by Troutman to the Receiver and for reimbursement of actual and necessary expenses incurred by Troutman in connection with such services from June 7, 2010, the date of Troutman's retention as counsel to the Receiver, through and including August 31, 2010, in the amount of $256,894.28.

Prior to her appointment as Interim Monitor, Ms. Cassirer and Troutman submitted a proposal to the Securities and Exchange Commission (the "SEC") in which Ms. Cassirer agreed that, if appointed receiver, she would render services in this action at an hourly rate of $250.00, a discount of approximately 64% off her normal hourly rate of $700.00 for legal services.  In that same proposal, it was further agreed that, if Ms. Cassirer were appointed receiver, Troutman attorneys would render legal services to her in that capacity at a discount of 10% off of their normal hourly rates, and further that the maximum hourly rate to be charged by any Troutman attorney would be $600.  The invoices rendered by the Receiver and Troutman in this action, and

---

[1] As previously indicated, on June 1, 2010, Aurora Cassirer was appointed Interim Monitor for Starr & Company, LLC, Starr Investment Advisors, LLC and Colcave, LLC.  She was appointed Temporary Receiver for the same entities on June 7, 2010 and Receiver for the same entities on July 8, 2010.  This first interim application for compensation includes services rendered by Aurora Cassirer as Interim Monitor, Temporary Receiver and Receiver.

the requests for compensation made by the Receiver and by Troutman in this First Interim Fee Application, reflect the discounted hourly rates specified by the Receiver and Troutman in their proposal to the SEC.  A schedule reflecting the hourly rates and total fees charged by the Receiver and by Troutman, for each of its attorneys and paraprofessionals, is annexed hereto as **Exhibit "D".**

As reflected in Exhibit "D" hereto, based upon the hourly rates that the Receiver and Troutman had agreed with the SEC to charge for this receivership, their requests for compensation in this First Interim Fee Application would have included fees of $68,025.00 for the Receiver and $339,866.05 for Troutman.  However, the Receiver and Troutman have agreed with the SEC that they would discount the amounts requested in this First Interim Fee Application by an additional 25%, resulting in a requested allowance of fees for the Receiver in the amount of $51,018.75 and for Troutman in the amount of $254,899.53.  By virtue of the discounts agreed to with the SEC before the commencement of this action, and the further discounts agreed to in connection with the instant application, the actual discounts applied to the Receiver's time charges for the first three months of the receivership amounts to approximately 73% for the Receiver and 32.5% for Troutman.  The SEC has agreed to support the Receiver's and Troutman's First Interim Fee Application as reduced by this further 25% discount and to recommend that any compensation awarded to the Receiver and Troutman be paid from available assets of the receivership estates.

No previous interim applications for compensation have been filed by the Receiver or Troutman and consequently, no compensation orders have been issued.  In support of this First Interim Fee Application, the Receiver and Troutman respectfully represent as follows:

## BACKGROUND AND SUMMARY OF ACTIVITIES

### A.      History of Proceedings

On May 26, 2010, the United States Attorney filed a complaint against Starr alleging that Starr "has utilized [the Starr Companies] to commit fraud."  Sealed Complaint at ¶ 7, United States v. Starr, 10-CR-00520-SAS-1 (S.D.N.Y. May 26, 2010).  On May 27, 2010, federal agents arrested Starr in the condominium he had just recently purchased in the name of Colcave for $7.5 million, using funds misappropriated from clients of the Starr Companies.  Also on May 27, 2010, the SEC commenced the within action in this Court against the above-captioned Defendants and Relief Defendants.  The SEC alleges in its Complaint that the Defendants perpetrated a fraudulent scheme, abusing the signatory power they had over their clients' bank and investment accounts and misappropriating client funds for their own purposes, and as a result directly or indirectly engaged in acts in violation of the Investment Advisers Acts of 1940 (the "Advisers Act").  *Complaint.* 2-7.

The Court found good cause to believe that the Defendants violated the Advisers Act.  Accordingly, on May 27, 2010, the Court entered an Order (Docket No. 2) imposing, among other things, asset freezes against the Defendants and the Relief Defendants and a constructive trust over a condominium unit located at 433 East 74th Street, New York, New York (the "Colcave Apartment") which was purchased in April of 2010 for approximately $7.5 million, and which the SEC alleges was purchased by Colcave (an entity organized by Kenneth Starr) with funds misappropriated from accounts of Starrco clients.

By Order of this Court dated June 1, 2010 (Docket No. 5), Aurora Cassirer, Esq. was appointed interim monitor for the Receivership Estates and granted the authority to monitor the expenses and transfers into and out of the bank accounts of the Receivership Estates.  On June 4, 2010, in advance of the June 7, 2010 scheduled hearing date for a preliminary injunction motion

filed by the SEC, the Receiver filed a First Report of Interim Monitor summarizing her activities as interim monitor for the first four days of her tenure as interim monitor (the "Monitor's Report") (Docket No. 11).

Ms. Cassirer's tenure as Interim Monitor continued until the June 7, 2010 hearing date when, although the SEC's preliminary injunction motion was adjourned, this Court issued an Order (Docket No. 13) appointing Ms. Cassirer temporary receiver for the Receivership Estates and granted her the authority to retain immediate custody and control of all assets and property of the Receivership Estates, and take all steps necessary to protect such assets and property.

On June 10, 2010, a federal grand jury empanelled in the United States District Court for the Southern District of New York handed down a twenty-three count indictment against Starr, including counts for wire fraud, money laundering, fraud by an investment advisor, and securities fraud (the "Federal Indictment").  The Federal Indictment charges Starr with having defrauded or attempted to defraud his victims of at least $59 million.  Federal Indictment at ¶ 4, United States v. Starr, 10-CR-00520-SAS-1 (S.D.N.Y. June 10, 2010).

On July 8, 2010, this Court heard from counsel with respect to the SEC's adjourned motion for preliminary injunctive relief and with respect to motions filed by Kenneth Starr and by the US Attorneys' Office seeking a stay of proceedings in the within action.  In advance of the said hearing, Ms. Cassirer submitted that certain First Report of the Temporary Receiver (the "Temporary Receiver's Report") (Docket No. 18) which, among other things, summarized her ongoing efforts to effectively administer the Receivership Estates through July 7, 2010, and requested that the Court grant the SEC's motion for preliminary injunction relief, thereby appointing the Receiver on a permanent basis.

Following counsels' presentations on July 8, 2010, this Court entered the Preliminary Injunction Order (Docket No. 19): (a) preliminarily enjoining, the Defendants from violating the Advisers Act; (b) freezing assets of the Defendants and Relief Defendants; (c) requiring the Defendants and Relief Defendants to render accountings; (d) preventing the Defendants and Relief Defendants from destroying, concealing or altering any books, records, documents, electronic data or computer files; (e) appointing the Receiver on a permanent basis over the Receivership Estates, with all of the powers set forth in the Preliminary Injunctions; and (f) preliminarily enjoining the Defendants and Relief Defendants from filing a bankruptcy proceeding without at least 3 days notice to the SEC and approval of the Court.

On September 10, 2010, Starr entered into a written plea agreement with the United States Department of Justice (the "Plea Agreement"), and confirmed his agreement in open court.  In accordance with the Plea Agreement, Starr pled guilty to three counts—one count of wire fraud, one count of money laundering, and one count of fraud by an investment advisor—with a statutory maximum sentence of forty-five years in prison.  The recommended sentence under the federal guidelines is 121 to 151 months.  In entering into the Plea Agreement, Starr acknowledged "that he has accepted this Agreement and decided to plead guilty because he is in fact guilty" of the alleged criminal conduct.  In addition, the Plea Agreement reflects Starr's agreement and admission that his criminal conduct has caused "a loss of more than $20,000,000."  Starr is scheduled to be sentenced in December of this year.

**B.      Administration of the Starr Companies' Receivership Estates**

The business of Starrco involved, in large measure, the management of the personal affairs of high-net-worth clients (including individuals, business entities, personal trusts and others).  As of June 1, 2010, based upon records that Ms. Cassier obtained at the Starr Offices,

and conversations with key employees of Starrco, it appeared that there were only 30 or 40 personal management clients left, down from approximately 140 just a month or two earlier, and the list of remaining clients was getting smaller each day as clients, or their attorneys or other representatives, asked that the clients' accounts be transferred to new management companies. By July 8, 2010, when Ms. Cassirer assumed the position of Receiver, the abandonment of Starrco by its former clients was complete and Starrco was out of the business of providing personal client management services.

The other principal component of the Starr Companies' business was the investment advisory and management business conducted by SIA, a registered investment advisory firm. Because of the government's freeze on bank accounts of the Starr Companies and related injunctive relief, as of June 1, 2010, when Ms. Cassirer was appointed Interim Monitor, there was no investment activity being conducted at SIA. Thus, as with Starrco, as of the date that Ms. Cassirer became the Monitor of SIA, that company was effectively no longer conducting business.

Through Starr's criminal actions, the Starr Companies have been completely destroyed. Since Starr's arrest, and as a direct result of the arrest and the public airing of details of his fraudulent scheme, the Starr Companies, which not too long ago were valuable going concerns, have lost every client and ceased operations. Moreover, Starr's criminal scheme, perpetrated in large measure through Starrco and SIA, has subjected the Starr Companies to numerous substantial liabilities to victims of that scheme, including many clients whose assets were misappropriated, diverted and misused by Starr. The Receiver cannot presently quantify the extent of such liabilities. However, as demonstrated by the Plea Agreement, those liabilities exceed $20,000,000. The Receiver believes that Starr's use of Starrco and SIA to perpetrate his

fraudulent scheme upon the clients of those entities was a deliberate, knowing and flagrant violation of Starr's fiduciary duties to those companies.  Starr is therefore liable to the Starr Companies for the losses he has caused to those entities.  Upon information and belief, those losses exceed $35,000,000.

1.      *Winding Down Activities at the Starr Offices (Billing Matters 000003-5).*

Following Ms. Cassirer's appointment as Monitor, and continuing steadily for weeks, she and her professionals were inundated with requests by representatives of former clients of the Starr Companies for delivery of the clients' files, including everything from current mail received by at the Starr Offices on behalf of clients (i.e., monthly bills, tax notices, investment account statements, etc.), to tax preparation materials needed for immediate tax filings, to historic account files at the Starr Offices or in off-site storage. These requests have been particularly daunting for two principal reasons.  First, by reason of subpoenas served by the US Attorney's Office, the Receiver is required to retain and preserve original client files.  That meant that the Receiver had to arrange with clients to have the client's files identified and boxed at the Starr Offices and turned over to an outside copying service for either copying or scanning at the client's expense, an extremely time consuming and laborious process.  In addition, the processing of client requests for files has been rendered all the more difficult and time consuming because the Receiver and her professionals have had little or no access to former Starrco employees who could have rendered valuable assistance to the Receiver in this process.

Although the requests of former clients of the Starr Companies were time consuming, and in many cases contentious, the Receiver and her professionals and clerical support staff at Troutman deemed those requests, and the interests of the former clients generally, to be of fundamental importance to the process of closing and liquidating the business of the Starr Companies.  As such, the requests of clients were given a very high priority and no doubt

accounted for a large part of the time devoted by the Receiver and her professionals and clerical support during the first several weeks after her appointment as Receiver.

By mid-August, 2010, the Receiver and Troutman had addressed the requests of former clients to the extent reasonably possible, while accommodating the interests of the government with regard to the preservation of documents, and it was time for the Receiver to proceed expeditiously to vacate the Starr Offices.  To that end, the Receiver undertook to box all client files and other business records and documents currently at the premises to prepare to move those documents into off-site storage.  Certain records and files deemed of significance to the Receivership Estates were moved to the Troutman Sanders' offices so that they will be readily accessible for review.  Nevertheless, there were approximately 1,975 boxes moved into storage between September 1, 2010 and September 9, 2010.  The Receiver had those boxes moved to GRM Information Management Systems ("GRM"), the same storage facility already used by Starrco for off-site storage of client files and business records, including electronic data.  The Starr Companies' monthly storage charges were approximately $33,000 for the months of June through August, 2010.  The Receiver expects that the monthly storage charges will increase substantially for September, 2010 and subsequent periods because of the greater volume of materials held in storage and the costs of moving those additional materials to GRM.[2]

In addition to the huge volume of files and business records that have been removed from the Starr Offices, the Receiver must dispose of some fifty (50) rooms (including offices,

---

[2] The Receiver proposed to the US Attorney's Office that the government take possession of the Starr Companies' client files and business records since the government has, by subpoena, required that the originals of those records be preserved.  Alternatively, the Receiver requested that the US Attorney's Office confirm that the Receiver will have access to funds that were in the Starr Companies' bank accounts as of the commencement of the Receivership Action for payment of the costs to store those files.  The government has declined to take possession of the files, but has indicated verbally that the government has Receiver will have access to at least part of the funds in the Starr Companies' accounts.

conference rooms, file rooms and mail room) full of used desks, chairs, computers, televisions, printers and other assorted furniture and office equipment.  With the exception of copying machines, which were leased from Ricoh Americas Corporation ("Ricoh"), all of the furniture and office equipment at the Starr Offices belongs to Starrco.  On August 20, 2010, the copy machines were returned to Ricoh's collection agent, Asset Recovery Specialists.

In order to dispose of Starrco's furniture and office equipment, the Receiver, through one of Troutman's office administrators who is assisting her on this matter, sought bids from professional liquidators.  The Receiver also had discussions with Starrco's landlord to determine whether the landlord had any interest in keeping the furniture and equipment at the premises, but the landlord declined.  The Receiver obtained bids from four professional liquidators.  Each one of those companies advised the Receiver that the furniture and equipment at the Starr premises has no market value, but each offered to remove and dismantle and remove all furniture and equipment from the premises for a price to be paid by the Receiver.  The best offer obtained by the Receiver came from Business Asset Consultants N.E. ("BAC"), which offered to dismantle and remove all furniture and equipment from the Starr premises for a payment of $11,900.00. The Receiver accordingly determined that it would be in the best interests of the Receivership Estates to accept BAC's proposal and arrange to have all of Starrco's furniture and equipment removed from the Starr premises as soon as possible, with the cost of removal, including the payment to BAC and any incidental expenses, to be paid by the Receiver from the Starrco Receivership bank account.

Troutman accordingly prepared a motion, which was filed on September 13, 2010, seeking the Court's approval for the Receiver's proposed disposition of Starrco's furniture and office equipment.  In that motion, the Receiver also sought leave to reject the lease on Starrco's

offices, the lease on Starrco's copy machines, and one additional contract.   In addition, in order to facilitate future dispositions of property, the motion sought approval for a protocol by which the Receiver could hereafter abandon property deemed of de minimis value, or reject additional contracts, without further orders of the Court.  On September 23, 2010, the Court issued an order granting the Receiver's motion (Docket No. 30).   Accordingly, Starrco's lease for its office premises has been rejected, effective upon vacating the premises (that process was completed on or about October 8, 2010), as has Starrco's copy machine lease.[3]

Separate from the business records that have been moved into storage, and the office furniture and equipment that will be disposed of through BAC, there are certain additional items of personal property at the 850 Third Avenue premises which the Receiver does not intend to dispose of at this time.  Such property includes the central computer servers used by the Starr Companies, which will be removed to the Troutman offices for storage.  In addition, there are numerous decorative objects, art works and collectibles at the Starr Offices, including photographs, paintings, drawings, pieces of art glass and baseball memorabilia, as well as personal photographs, books and other personal effects.  The Receiver has had those items of a personal nature moved to the Troutman offices for later disposition.  The Receiver has not yet had such items professionally appraised, but she intends to do so.  It is likely that Kenneth Starr or others will assert an ownership interest in all or some of those items of tangible personal property, and any such claims of ownership will have to be resolved.  At this point in the liquidation process, the Receiver's priority is to vacate the Starr Offices.  After that task is

---

[3] During the course of administering the Starrco estate, the Receiver also discovered that Starrco is the named tenant under a residential lease for an apartment on 79th Street in Manhattan, which, with the consent of the landlord, has at all times been occupied by Starr and his wife and not by Starrco.  Accordingly, as part of her motion, the Receiver sought an order deeming Starrco's lease for the 79th Street apartment to be rejected, and that relief was granted.

accomplished, the Receiver can address the disposition of the items of tangible personal property that will then remain in the Receiver's possession.

### 2. *Asset Investigation and Recovery Activities (Billing Matter 000002)*

The Court can appreciate from the foregoing discussion that the few tangible or intangible assets that are held in the name of the Starr Companies will not likely produce sufficient proceeds to permit a material distribution to victims of Kenneth Starr's apparent fraud. However, based upon investigations that the Receiver and her professionals have conducted during the First Interim Fee Period, including the examination of documents at the Starr offices and conversations with key employees of the Starr Companies, the Receiver believes that there may be significant claims that could be pursued by the Starr Companies' receivership estates and numerous assets that might be recovered by the receivership estates for the benefit of victims and other creditors.

In this regard, the Receiver is uniquely situated to pursue fraudulent conveyance claims based upon transfers made by the Starr Companies for less than adequate consideration. She can also pursue malpractice claims, or claims for breach of fiduciary duty, against professionals who represented the Starr Companies. Such claims are separate and apart from, and would not overlap with, any criminal forfeiture claims that the US Attorney's Office has standing to pursue on behalf of victims. In addition, it appears that numerous entities formed by Kenneth Starr hold investment interests or properties that Kenneth Starr obtained in exchange for inducing clients of the Starr Companies to make certain investments, or by using funds diverted from accounts of the Starr Companies or clients of the Starr Companies. The Receiver would maintain that such assets rightfully belong to the Starr Companies and should be recovered and liquidated for the benefit of victims. In addition, and perhaps most importantly, the Receiver can pursue claims for breach of fiduciary duty against Kenneth Starr, whose criminal activities have destroyed the Starr

Companies and left them subject to millions of dollars of liabilities to victims of his fraudulent scheme.

Before the Receiver can commence actions to pursue claims or assets as aforesaid, she needs to conduct further extensive examinations of available documentary evidence, and to obtain relevant records from third parties who had business dealings with Kenneth Starr or his companies.   To that end, during the First Interim Fee Period, the Receiver and Troutman prepared and served numerous third-party document subpoenas seeking the production of documents from banking and brokerage institutions that conducted business with Starr Companies or Kenneth Starr, and from four law firms who represented the Starr Companies in various matters.   It appears that two of those law firms, and a former partner of both of those firms (who has also been subpoenaed individually), represented the Starr Companies and conducted numerous substantial escrow transactions purportedly on behalf of the Starr Companies, through which funds taken from the accounts of Starr Company clients were apparently diverted and misappropriated to the personal purposes of Kenneth Starr.

The Receiver has already received tens of thousands of pages of documents, partly in hard copies and partly on electronic storage media, and the Receiver expects to receive thousands of additional pages.   These documents include records of numerous bank accounts and brokerage accounts which will have to be carefully and extensively analyzed and meticulously cross-referenced to trace the flow of funds in possibly hundreds of transactions in which Kenneth Starr, acting individually and through Starrco, misappropriated funds of Starrco clients and diverted and misused those funds to serve their own illicit purposes.   These records also include documentation concerning the organization and operations of numerous entities formed by Kenneth Starr (and owned by Kenneth Starr or another Starr family member), through

which funds of Starrco and SIA clients were invested in business ventures identified by Starr, and the involved Starr entity also acquired an interest.

The Receiver believes that a thorough forensic investigation of the business and affairs that Kenneth Starr conducted through Starrco, SIA and numerous other entities organized by Kenneth Starr, would identify and substantiate a history of fraudulent transactions and misappropriations perpetrated upon the clients of Starrco and SIA over a period of several years, and would identify claims and assets that should be pursued for the benefit of victims of Starr's fraudulent conduct.  Based upon the work done by the Receiver and Troutman to date, the Receiver can now focus her efforts and the efforts of her professionals on those matters that promise the greatest benefit for the costs that would be incurred.  The Receiver has identified qualified forensic accountants who could assist her in this process and the Receiver intends to explore the possibility of retaining such accountants, and possibly legal counsel, on a contingency basis to investigate, and where appropriate, to pursue claims and assets.

### 3. Claims Administration Activities (Billing Matter 000006)

During the First Interim Fee Application, the services rendered by the Receiver and Troutman during the First Interim Fee Period did not involve a significant expenditure of time relating to claims administration matters.  The Receiver has determined that she should not initiate a claims process, and invite parties to file claims, until she is able to conclude that she will be able to make a distribution to creditors.  Accordingly, the Receiver and Troutman have advised those who make inquiries concerning a claims process that they will receive notice and will have an opportunity to file a claim when a claims process is instituted.

### 4. *Employee Matters (Billing Matter 000007)*

Recognizing the harsh reality of the situation at the Starr Companies, including the fact that there were no funds available to pay payroll, that employees could not expect to be covered by a current health insurance policy, and that employees' 401(k) contributions had apparently been diverted by Kenneth Starr, very soon after she was appointed temporary receiver Ms. Cassirer was compelled by circumstances to confirm to all of the employees of the Starr Companies that their employment had to be terminated.  Accordingly, from and after June 11, 2010, the Starr Companies no longer had any employees.

During the monitorship period, and continuing into the receivership period, Ms. Cassirer and Troutman were forced to address many questions and concerns raised by employees of the Starr Companies concerning whether or how they may ever collect claims for unpaid wages or benefits, what alternatives the employees have for new health coverage, whether and how the employees will be able to access their funds in the Starrco 401(k) Plan.  With the advice of benefits professionals of Troutman, the Receiver determined that the documentation of the Starrco 401(k) Plan was sufficiently up to date to permit employees to make withdrawals without facing undesirable tax consequences, and the Receiver has since processed numerous requests by former employees for access to their funds.  In addition, with advice from her benefits attorneys at Troutman Sanders, the Receiver has urged plan participants to roll their funds into personal IRA or other types of accounts so that Starrco's 401(k) Plan can be wound down.

## C.     Administration of the Colcave Receivership Estate

Based upon the Receiver's review of available documents and government pleadings, and interviews of key Starrco employees, it appears that Colcave was formed by Starr for the purpose of acquiring the condominium apartment on East 84th Street in Manhattan which was the

principal place of abode of Starr and his wife, Dianne Passage, at the time of Starr's arrest. Since Colcave does not conduct business in the traditional sense, it does not generate income.

At the time that this action was commenced, and at the time the Receivership was commenced, Colcave had the sum of $716,971.57 in a bank account, consisting of proceeds from mortgage financing obtained by Starr subsequent to the purchase of the Colcave apartment. The funds in the Colcave bank account have at all times during the Receivership been frozen by the SEC and DOJ, and accordingly, the funds in that account have not been available to the Receiver for any purpose. To the Receiver's knowledge, there have been no deposits into that account or withdrawals from that account during the Receivership. Upon her appointment as Receiver, Ms. Cassirer did open a Colcave receivership bank account, but there have been no funds deposited into that account.

Colcave has recorded mortgage liabilities in the principal amount of $4,000,000 (A first and a second mortgage of $2,000,000 each). The Receiver has not determined whether those mortgage liabilities are subject to any defenses. In addition, Colcave has incurred and failed to pay common charges owed to the condominium association for the Colcave apartment. Those common charges accrue at the rate of $7,038.48 per month and, through August 31, 2010, totaled $21,115.44 (exclusive of late charges). The Receiver and Troutman have communicated on several occasions with the condominium association regarding these charges and have also communicated on several occasions with the DOJ to seek to have funds in the Colcave bank account used to pay those liabilities on a current basis. Those communications have not been successful to date but are ongoing.

During the First Compensation Period, the Receiver and Troutman also communicated with the DOJ to encourage efforts to sell the Colcave apartment so that the Colcave estate can

minimize its accruing liability for debt service and common charges. The DOJ indicated a preference to sell the apartment using the US Marshall's Office, when appropriate. Pursuant to the Plea Agreement reached by Starr and the DOJ, Starr has agreed that the Colcave apartment will be forfeited to the government. Under the foregoing circumstances, the DOJ currently is in control of the timing and manner of disposition of the Colcave apartment and the proceeds of the Colcave estate, and with respect to the payment of debt service and common charges on the Colcave apartment. The Receiver and Troutman reserve the right to seek an appropriate contribution from the proceeds of the Colcave estate toward the costs of administration of the receivership estates.

**D.     Assets, Liabilities, Receipts and Disbursements of the Receivership Estates[4]**

**1.     *Receipts and Available Funds***

Based upon her investigation of the Starr Companies' books and records, the Starr Companies and Colcave had the following amounts of cash on hand in bank accounts as of June 1, 2010, the date of Ms. Cassirer's appointment as Interim Monitor:

Starrco          $139,977.19

SIA              $1,795.70

Colcave          $716,971.57

As of June 1, 2010 and since that date, the foregoing accounts, and the funds in those accounts, have been frozen by the SEC and DOJ, and accordingly, to the knowledge of the Receiver, the balances in those accounts have not changed.

Immediately upon her appointment as Receiver, Ms. Cassirer opened a receivership bank account for each of Starrco, SIA and Colcave. The Receiver has deposited into the Starrco and

---

[4] Separate Standardized Fund Accounting Reports for each of the Starrco estate, the SIA estate and the Colcave estate, in the format specified by the Billing Instructions, are annexed hereto as Exhibit "A."

SIA accounts fee payments made by former clients of those entities, and the Receiver has paid certain estate expenses from those accounts. The Colcave receivership account has at all times had a zero balance. As of August 31, 2010, the balances in the Starrco and SIA receivership accounts were as follows:

| | |
|---|---|
| Starrco | $188,506.73 |
| SIA | $8,550.00 |

In addition to the amounts in the foregoing receivership accounts, the DOJ has indicated to the Receiver that the receiver will have access to approximately $117,000.00 of funds in the Starrco accounts referenced in the preceding paragraph which funds can be traced to fee payments made by clients of Starrco. Including that amount, the total unencumbered funds available to the Receiver amounted to approximately $314,056.73 as of August 31, 2010.

## 2. *Disbursements*

The Receiver made few disbursements from the Starrco and SIA receivership accounts during the First Interim Fee Period. The following is a list of each disbursement of $1,000 or greater made by the Receiver during the period from one of the receivership accounts:

a.  $1,054.15 paid to Phillip Stafford, Starrco's outside IT consultant, for services relating to the archiving of data in the Starrco computer systems, the routing of Starrco emails to a receiver address, and providing former Starrco and SIA clients access to electronic tax files; and

b. $10,611.48 paid to copy service DTI for scanning of certain Starrco records for preservation and use at the Troutman offices.

### 3. *Accrued and Unpaid Administrative Expenses*

The accrued and unpaid administrative expenses of the Starrco and SIA receivership estates amounted to approximately $360,000.00, as of August 31, 2010. The largest single accrued and unpaid administrative expense is the Receiver's and Troutman's fees and disbursements of $308,024.75, as requested in this application. The other material accrued and unpaid administrative expenses as of August 31, 2010 include: (a) storage fees for Starrco's outside storage of client files and business records at GRM amounting to approximately $33,000.00; (b) charges for additional storage facilities rented by Starrco as of the commencement of the receivership in the approximate amount of $3,100.00; (c) expenses relating to the telephone systems and services maintained by Starrco, which remained in use during part of the receivership in the approximate amount of $6,500.00; (d) Lexis/Nexis charges for services used by Starrco employees in the approximate amount of $2,800.00; and (e) UPS charges of approximately $571.00.[5] In large part, the foregoing amounts are based upon invoices rendered to the Starr companies from and after June 1, 2010 by vendors who were providing services to the Starr Companies before the receivership and continued to do so after the receivership was commenced. Before the foregoing expenses can be definitively allowed, the Receiver must analyze each and determine to what extent, if any, each such expense resulted in a benefit to the receivership estates.[6]

---

[5] The landlord for Starrco's office premises at 850 Third Avenue, New York, New York, has agreed to a termination of Starrco's lease and a mutual release of obligations under that lease. By virtue of that agreement, any administrative liability the Starrco estate may have had for the use of the 850 Third Avenue premises from and after the commencement of the receivership would be released. This agreement was of substantial benefit to the receivership estates because the rent accruing under the lease amount to approximately $80,000 per month.

[6] The accrued and unpaid expenses of administration include invoices from various vendors, including Verizon, AT&T, UPS and several others, relating to goods or services provided both before and since the commencement of the receivership. The Receiver's calculation of accrued administrative expenses is necessarily estimated for this additional reason.

It appears that the business of the Starr Companies was run for the most part on the books of Starrco and not SIA.  For example, all employees working in the Starr Company offices were on the payroll of Starrco and all benefits for said employees were provided by Starrco. Similarly, the leases for the offices premises and copy machines used by both Starrco and SIA were in the name of Starrco.   Therefore, with the exception of the Receiver's fees and Troutman's fees, the administrative expenses of the Starr Companies' receivership estates are accruing on the books of Starrco.

With regard to the Colcave receivership estate, as indicated above, Colcave has accruing and unpaid liabilities for condominium common charges of $21,115.44 (exclusive of late charges) for the period from June 1, 2010 through August 31, 2010.  The Receiver is not aware of any other accruing administrative liabilities for that estate.   In addition to accruing administrative liabilities, the Colcave estate is accruing interest obligations on the two $2,000,000 mortgages that encumber the property.  Based upon the stated interest rate of 12.5% (not the default rate) in the loan documents for each of these two mortgage loans, interest on the mortgages accrues at the rate of $41,667.46 per month and thus totals $125,002.38 for the three months of the months of June through August, 2010.

### 4.        Assets of the Receivership Estates

To the best of the Receivers' knowledge, based upon her examination of available records of the Starr Companies and interviews of certain key Starr employees, as of the commencement of the receivership, the assets on the books of Starrco consisted of:

a.   **Accounts Receivable**.  Since the commencement of the receivership and through the date of this application, the Receiver has collected and deposited into the receivership accounts fee payments made by former clients totaling $221,269.86 for Starrco and $20,529.97 for SIA.  Receivables remaining on the books of Starrco and SIA amount

to more than $1,400,000. However, the Receiver believes that she has collected substantially all fee payments that will be made by former clients of the Starr Companies on a voluntary basis. Thus, additional collections, if any, will very likely be made only through litigation. The Receiver cannot presently estimate the amount of collections that will be recovered through litigation.

b. **Furniture and Equipment**, including some fifty (50) offices of used office desks, cabinets, computers, printers and the like. As described above, collectively Starrco's used furniture and equipment has no market value, and as a result, the Receiver has been forced to pay a liquidator to dispose of such furniture and equipment (in order to vacate the Starr office premises) at a cost to the receivership estates of $11,900.

c. **Additional Personal Property,** including collectibles, art work, books, photographs and other items of personal property located at the Starrco office premises. These items were removed from the Starrco office premises in September, 2010 and stored at Troutman's offices to protect and preserve them pending further disposition. These items have not been professionally appraised, but they do not appear to be of sufficient value to generate a material recovery for creditors. Indeed, it is possible that such items will not generate proceeds sufficient to pay the costs of moving and preserving those items for a sale. Moreover, Starr may claim a personal interest in some or all of these items which would have to be evaluated, and if necessary resolved by the Receiver.

d. **The Colcave Apartment**. In or about April, 2010, Starr (in the name of Colcave) purchased the condominium on East 84th Street for $7.5 million. Subsequently, Starr borrowed $4,000,000 collectively from two lenders and granted mortgages on the

apartment as collateral for the loans.   Of the amount borrowed, approximately $716,000 remained in Colcave's bank account at the time of Starr's arrest, and remains in that account to this day.   The Receiver has not had the Colcave apartment professionally appraised, but given the fact that the apartment was purchased within the last six months, it is not unreasonable to assume that the apartment is worth substantially what Starr paid for it.   The Receiver is confident that, if the Colcave apartment is sold reasonably soon, the sale will provide proceeds substantially in excess of the liens on the property, consisting of the claims of the mortgagees and the common charges owed to the condominium association.

     e.   **Litigation Claims**.  As described at pages 12-14 above, the Receiver has begun a forensic investigation to identify claims that may be asserted and assets that may be recovered on behalf of the Starr Company receivership estates and their creditors.  The Receiver has been hampered in this regard by a lack of funds, and the consequent inability to retain forensic accounts, but nevertheless has preliminarily identified numerous claims and assets that she believes worthy of pursuit.  At this stage of the receivership proceedings, it would be premature to discuss such claims and assets in detail or to venture an estimate of their value to the receivership estates. The Receiver is confident, however, that she has claims and assets to pursue sufficient to generate a significant distribution to creditors.

## COMPENSATION REQUESTED

Troutman seeks allowance of compensation for professional services rendered during the First Interim Fee Period from June7, 2010 through August 31, 2010 in the aggregate amount of $254,899.53 and for reimbursement of actual expenses incurred in connection with the rendition

of such services in the aggregate amount of $1,994.75, for a total request of $256,894.28.  As previously stated, prior to Ms. Cassirer's appointment as Interim Monitor, Troutman agreed that, if Ms. Cassirer were appointed Receiver, Troutman's attorneys would render legal services to her in that capacity at a discount of 10% off of their normal hourly rates, and further that the maximum hourly rate to be charged by any Troutman attorney would be $600.  The invoices rendered by the Receiver and Troutman in this action and the requests for compensation made by the Receiver and by Troutman in this First Interim Fee Application, reflect the discounted hourly rates specified by the Receiver and Troutman in their proposal to the SEC.  The fees actually requested by Troutman reflect the further 25% discount agreed to in connection with this First Interim Fee Application.

This First Interim Fee Application has been prepared in accordance with the Billing Instructions.  Applicants' certification of compliance with the Billing Instructions is annexed hereto as Exhibit "B."

The Receiver seeks allowance of compensation for professional services rendered during the First Interim Fee Period from June 1, 2010 through August 31, 2010 in the aggregate amount of $51,018.75 and for reimbursement of actual expenses incurred in connection with the rendition of such services in the aggregate amount of $111.72, for a total request of $51,130.47 (the "Total Compensation Amount").   As previously stated, prior to her appointment as Interim Monitor, Ms. Cassirer and Troutman submitted a proposal to the SEC in which Ms. Cassirer agreed that, if appointed receiver, she would render services in this action at an hourly rate of $250.00, a discount of approximately 64% off her normal hourly rate of $700.00 for legal services.  The fees actually requested by the Receiver reflect the further 25% discount agreed to in connection with this First Interim Fee Application.

The fees sought by Troutman in this First Interim Fee Application reflect an aggregate of 1,320.70 hours of attorney and paraprofessional time spent and recorded in performing services for the Receiver and their estates during the First Interim Fee Period at a blended average hourly rate of $193.01 for both attorneys and paraprofessionals.  The blended hourly rate for attorneys only is $267.25.

As previously indicated, because the revelation of Starr's criminal activities had doomed the businesses of the Starr Companies, within days of her appointment the Receiver had to notify all remaining employees of the Starr Companies that their employment was terminated. Moreover, because of the paucity of funds in the receivership estates, the Receiver was not able to retain an accounting firm to provide accounting, tax, forensic and general office administrative services.  The Receiver and Troutman have therefore been forced to find creative solutions to accomplish by themselves in an efficient and economical manner a host of tasks that would normally have been performed by the Starrco employees or the Receiver's retained accountants In particular, as described above, from the moment of her appointment, the Receiver was faced with, and addressed, time-sensitive requests made on behalf of well over one hundred former clients for access to records maintained by the Starr Companies, records which were subject to government subpoenas and therefore could not be turned over to those  former clients.  Once the Receiver had addressed all of those requests to the extent reasonably possible, the Receiver was faced with the daunting task of indexing and preparing the huge volume of files at the Starrco offices for movement into long-term storage so that the Starrco offices could be vacated. Vacating the Starrco offices also involved the disposition of some fifty (50) rooms of used furniture and office equipment, as well as a sizable number of collectibles, objects of art and other items of personal property located at the Starrco premises.  In addition, to the foregoing,

the Receiver had to open and maintain bank accounts and the accounting records for the estates, additional tasks usually performed by administrative employees of the receivership companies or retained accounts.

To perform such tasks in an efficient and economical manner, the Receiver determined that it would be in the best interests of the estates to employ experienced members of Troutman's administrative staff accustomed to, and expert at, the types of services to be performed.   As Troutman has done in similar situations in the past, for those employees deemed critical to this process, Troutman calculated the employee's hourly rate of compensation, and charged that rate, with no markup, for the time expended by those employees on behalf of the Receiver.  As the attached time records reflect, the rates charged for such administrative personnel are substantially lower than the rates of Troutman's paraprofessionals who would have been called upon to perform such services if expert staff was not available.

## TIME AND EXPENSE RECORDS

Troutman maintains computerized records of the time expended in the rendition of the professional services required by the Receiver and the estates.  These records are maintained in the ordinary course of Troutman's practice.  For the convenience of the Court and all parties in interest, attached hereto and marked as **Exhibit "D"** hereof is a billing summary for the First Interim Fee Period, setting forth the name of each attorney and paraprofessional and administrative employee assigned to this case, each attorney's year of bar admission and area of practice concentration, the aggregate time expended by each attorney, paraprofessional and employee, and the hourly billing rate charged for each attorney, paraprofessional and employee at the discounted rates agreed to with the SEC.

Troutman's normal hourly rates are set at a level designed to fairly compensate Troutman for the work of its attorneys and paraprofessionals and to cover fixed and routine overhead

expenses.  Hourly rates vary with the experience and seniority of the individuals assigned.  These hourly rates are subject to periodic adjustments to reflect economic and other conditions and are consistent with professional hourly rates charged elsewhere.  As indicated above, Troutman's normal hourly rates for attorneys have been discounted for purposes of this engagement.

Troutman also maintains computerized records and copies of back-up documentation for all expenses incurred in connection with the performance of professional services.  Copies of these computerized records in the format specified by the Billing Instructions and other back-up records are available if requested by the SEC, the Court or other parties in interest as appropriate, and subject to the preservation of privileges or confidentiality, where applicable.

There is no agreement or understanding between Troutman and any other person, other than members of the Troutman firm, for the sharing of compensation to be received for services rendered in this case.

As required by the Billing Instructions and as stated above, a certification regarding compliance with same is attached hereto and marked as **Exhibit "B"** hereof.

As stated above, annexed hereto as **Exhibit "D "** is a detailed schedule listing all of the Troutman attorneys and paraprofessionals who have performed services in this case during the First Interim Fee Period (and for whom compensation is sought) and describing each such attorney's and paraprofessional's year of bar admission, if applicable, area of practice concentration, aggregate time expended, hourly billing rate and the individual amount requested as part of this application for compensation.

As set forth above, annexed hereto and marked as **Exhibit "C"** hereof is a schedule of the total amount of fees and expenses incurred under each Project Category used by the

Applicants during the First Interim Fee Period.  The Project Categories created for this case are

as follows:

Project Categories

| Matter Number | Matter Name |
|---|---|
| 001 | Receiver Services, SEC v. Starr et al. |
| 002 | Asset Analysis and Recovery |
| 003 | Asset Disposition |
| 004 | Business Operations |
| 005 | Case Administration |
| 006 | Claims Administration and Objections |
| 007 | Employee Benefits and Pensions |
| 008 | Scorsese[7] |

Annexed hereto and marked as __*Exhibit "F"*__ hereof are the Monthly Statements of the

Receiver and Troutman for the period covered by this Application.  Throughout the First Interim

Fee Period, Troutman has provided the SEC with copies of its invoices, which reflect

Troutman's detailed time entries.  Such detailed descriptions demonstrate that Troutman was

heavily involved in the performance of services for the Receiver on a daily basis, often under

extreme time pressure to meet the needs of the Receiver and the estates in this case.  The fees

charged by the Receiver and Troutman break down by project category as follows:

*1.      Receiver Services - Sec v. Starr et al. (Matter 001)*

(Fees: $68,247.00; Hours: 273.30)

*2.      Asset Analysis and RecoveryAsset (Matter 002)*

(Fees: $119,149.25; Hours: 391.90)

*3.      Asset Disposition (Matter 003)*

(Fees: $-0-; Hours: 0.00)

---

[7] This is a litigation matter which Troutman has agreed with the SEC to pursue on a contingent fee basis.
Accordingly, time devoted by Troutman to this matter is not included in this First Interim Fee Application.

*4.      Business Operations (Matter 004)*

(Fees: $55,192.35; Hours: 413.80)

*5.      Case Administration (Matter 005)*

(Fees: $152,372.40; Hours: 475.50)

*6.      Claims Administration and Objections (Matter 006)*

(Fees: $-0-; Hours: 0.00)

*7.      Employee Benefits and Pensions (Matter 007)*

(Fees: $12,930.05; Hours: 38.30)

## REASONABLE AND NECESSARY SERVICES RENDERED BY TROUTMAN

During the First Interim Fee Period, Troutman provided significant, substantial and exhaustive professional services to the Receiver in connection with this case.  These services were often performed under severe time constraints and multiple constituency pressure and were necessary to administer a multitude of critical issues typically faced by Receivers in cases of this magnitude, scope and complexity.  The more significant professional services rendered by the Receiver and Troutman have been described above by project category.

The foregoing professional services rendered by the Receiver and by Troutman on behalf of the Receiver and the estates during the First Interim Fee Period were reasonable, necessary and appropriate to the administration of this case.

The great majority of the services performed by partners and associates of Troutman were rendered by Troutman's Restructuring Group and its Complex Litigation Group. Troutman has prominent practices and enjoys a national and international reputation for its expertise in these areas.  The attorneys at Troutman have represented receivers and trustees in many large chapter 11 cases and other insolvency proceedings and litigation matters.  As a consequence,

Troutman has brought to this receivership action a particularly high level of expertise, which inured to the benefit of the Receiver, the receivership estates and all parties in interest.

During the First Interim Fee Period, Troutman has advised and assisted the Receiver in every phase of this case.  To this end, as set forth in detail in **Exhibit "D"** of this First Interim Fee Application, Troutman partners, associates and paraprofessionals from various Troutman practice groups, together with experienced administrative personnel, expended time rendering professional services on behalf of the Receiver and the estates.  Notwithstanding the great number and the complexity of issues facing the Receiver, the Receiver and Troutman sought to keep the staffing for this matter as lean as possible, and we believe that we were quite successful in that regard.  As discussed more fully above, the vast majority of the legal services provided to the Receiver and the estates by Troutman is primarily attributable to the work performed by attorneys in the Restructuring and Litigation Groups.

During the First Interim Fee Period, Troutman's hourly billing rates for attorneys ranged from $202.50 to $600.00.  Allowance of compensation in the amount requested would result in a blended hourly billing rate for attorneys of approximately $267.25 (based on 720.60 recorded attorney hours billed at the discounted rates agreed to by Troutman (10% discount and cap of $600 per hour, and further reduction of 25%).  The hourly rates and corresponding rate structure utilized by Troutman in billing for its services in this receivership reflect the terms of a proposal made to the SEC by the Receiver and Troutman prior to the commencement of this action. Before the agreed discounts, Troutman's rates were equivalent to the hourly rates and corresponding rate structure predominantly used by Troutman for restructuring, workout, bankruptcy, insolvency and comparable matters, and similar complex corporate, securities and litigation matters whether in court or otherwise, regardless of whether a fee application is

1424100v2

required.  These rates and rate structure reflect that such particular matters are typically national in scope and typically involve great complexity, high stakes and severe time pressures.

### ACTUAL AND NECESSARY EXPENSES INCURRED BY TROUTMAN

As set forth in **Exhibit "E"** attached hereto, the Receiver has incurred a total of $111.72 in expenses and Troutman has incurred a total of $1,994.75 in expenses on behalf of the Receiver in providing professional services during the First Interim Fee Period.  Regarding these expenses, the Receiver and Troutman do not charge for internal copying; if it is deemed necessary to utilize an outside service, we bill only for external copying charges at the provider's cost without markup; and charges for computer research are at the provider's cost (which is at a reduced rate) without markup.  The basis for these rates is Troutman's calculation of the actual cost of these services.  In addition, Troutman does not charge for any facsimile service.  Each of these categories of expenses does not exceed and, in some instances, is well below the maximum rate set by the Billing Instructions.  These charges are intended to cover Troutman's direct operating costs, which costs are not incorporated into the Troutman's hourly billing rates.  Only clients who actually use services of the types set forth in **Exhibit "E"** and of this First Interim Fee Application are separately charged for such services.  The effect of including such expenses as part of the hourly billing rates would impose that cost upon clients who do not require extensive photocopying and other facilities and services.

The time constraints imposed by the circumstances of these cases required Troutman attorneys and other employees to devote time during the evenings and on weekends to perform legal services on behalf of the Receiver.  These extraordinary services were essential to meet deadlines, timely respond to inquiries on a daily basis from various creditors and other parties in interest and ensure the orderly administration of the estates.  Consistent with firm policy, as further disclosed in the Troutman retention application, attorneys and other Troutman employees

1424100v2

who worked late in the evenings or on weekends were reimbursed for their reasonable meal and transportation costs, and where required under Troutman's employment policies employees were paid appropriate overtime.  Troutman's regular practice is not to include components for those charges in overhead when establishing billing rates, but rather to charge its clients for these and all other out-of-pocket disbursements incurred during the regular course of the rendition of legal services.  Notwithstanding Troutman's usual and customary policies and practices with respect to such expenses, in order to comply with the Billing Instructions Troutman has not sought reimbursement for such expenses in this application.

On occasion, overnight delivery of documents and other materials was required as a result of the exigencies and circumstances of these cases.  The disbursements for such services are not included in Troutman's overhead for the purpose of setting billing rates and Troutman has made every effort to minimize its disbursements in these cases.  The actual expenses incurred in providing professional services were necessary, reasonable and justified under the circumstances to serve the needs of the Receiver in this case.

## TROUTMAN'S REQUESTED COMPENSATION AND REIMBURSEMENT SHOULD BE ALLOWED

Troutman respectfully submits that the services for which it seeks compensation in this First Interim Fee Application were, at the time rendered, believed to be necessary for and beneficial to the Receiver and the estates and were rendered in order to protect and preserve same.  Troutman respectfully submits that the services rendered to the Receiver were performed economically, effectively and efficiently and the results obtained to date have benefited not only the Receiver, but also the estates and creditors.  Troutman further submits that the compensation requested herein is reasonable in light of the nature, extent and value of such services to the Receiver, the estates and all parties in interest.

As demonstrated by this First Interim Fee Application and all of the exhibits submitted in support hereof, the Receiver and Troutman spent their time economically and without unnecessary duplication.  In addition, the work conducted was carefully assigned to appropriate attorneys or paraprofessionals according to the experience and level of expertise required for each particular task.  The Receiver and Troutman's attorneys and paraprofessionals spent a total of 1,592.80 hours during the First Interim Fee Period.  By virtue of the discounts originally agreed to by Troutman, the resulting time charges of $407,891.05 were already materially less than the fair market value of the services rendered.  Now that the Receiver's and Troutman's time charges have been reduced an additional 25%, those time charges are very substantially less than the fair market value of the services rendered.

In sum, the services rendered by the Receiver and Troutman were necessary and beneficial to the Receiver and the estates, and were consistently performed in a timely manner commensurate with the complexity, importance, novelty and nature of the issues involved. Accordingly, approval of the compensation sought herein is warranted.

## <u>NOTICE</u>

Pursuant to the Billing Instructions, The Receiver and Troutman provided this application and all exhibits referenced therein to SEC counsel for a thirty (30) day review period.   The Receiver and Troutman are filing this application subsequent to the expiration of said thirty (30) day period.

Upon filing this Application with the Court, it will simultaneously be provided via ECF to all participants registered to receive notice in this case.

1424100v2

## CONCLUSION

**WHEREFORE**, the Receiver respectfully requests entry of an order (i) allowing and awarding fees for professional services rendered during the First Interim Fee Period in the amount of $51,018.75 and reimbursement of actual expenses incurred in connection with the rendition of such services in the aggregate amount of $111.72, for a total request of $51,130.47; and (ii) granting the Receiver such other and further relief as just and proper; and

Troutman respectfully requests entry of an order (i) allowing and awarding fees for professional services rendered during the First Interim Fee Period in the amount of $254,899.53 and reimbursement of actual expenses incurred in connection with the rendition of such services in the aggregate amount of $1,994.75, for a total request of $256,894.28; and (ii) granting Troutman such other and further relief as just and proper.

New York, New York
Dated: November 18, 2010

Respectfully submitted,

TROUTMAN SANDERS LLP


By:_____/s/ Lee W. Stremba_____
        Lee W. Stremba

        The Chrysler Building
        405 Lexington Avenue
        New York, NY 10174

1424100v2

STATE OF NEW YORK     }
                            }      ss.:
COUNTY OF NEW YORK   }

Harriet E. Cohen, being duly sworn, deposes and says:

I am not a party to this action, I am over the age of twenty-one years and I reside in Queens, New York.

On November 18, 2010, the foregoing document and accompanying exhibits were served upon all the parties requesting notice in this case via the court's electronic filing system.

In addition, the documents were also sent via email on November 18, 2010 to:

**Timothy John Casey, Esq.**
Securities & Exchange Commission (3 WFC)
3 World Financial Center, Room 4300
New York, NY 10281
Email: caseyt@sec.gov

**Michael Scott Bosworth, Esq.**
United States Attorney Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Email: michael.bosworth@usdoj.gov

                                       _____/s/ *Harriet E. Cohen*_____
                                         Harriet E. Cohen

Sworn to before me this
18th day of November, 2010

     _____/s/ *Anthony Cardillo*_____
              Notary Public

Anthony Cardillo
Notary Public, State of New York
No. 03-486-0234
Qualified in Bronx County
Commission Expires March 18, 2014